IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FABRAL, INC.,                        )
                                     )  Civil Action
              Plaintiff              )  No. 09-cv-00279
                                     )
        vs.                          )
                                     )
B&B ROOFING COMPANY, INC.,           )
  doing business as B&B Roofing      )
  & Metals, Inc.;                    )
B&B METALS OF MIDDLESBORO, INC.,     )
  doing business as B&B Roofing      )
  & Metals, Inc.;                    )
B&B METALS, LLC,                     )
  doing business as B&B Roofing      )
  & Metals, Inc.; and                )
GARY M. BREWSTER,                    )
                                     )
              Defendants             )

                        *    *    *


APPEARANCES:

          CHRISTOPHER H. CASEY, ESQUIRE
                On behalf of Plaintiff

          C. PATRICK SEXTON, ESQUIRE
                On behalf of Defendants

                        *    *    *


                      ADJUDICATION

JAMES KNOLL GARDNER,
United States District Judge

        The undersigned presided over a non-jury trial

conducted March 1 and 2, 2011 on the Complaint of plaintiff

Fabral, Inc. against defendants B&B Roofing Company, Inc.

("Roofing"), B&B Metals of Middlesboro, Inc. ("Middlesboro"),

B&B Metals, LLC ("LLC") (each doing business as B&B Roofing &

Metals, Inc.), and Gary M. Brewster.[1]  At the close of the trial, I took the matter under advisement.  Hence, this Adjudication.

Plaintiff is a supplier of construction materials. Plaintiff sued defendants for breach of a Credit Application and Agreement.  In its Complaint, plaintiff seeks damages for amounts due on outstanding invoices for construction materials sold to defendants, late charges, attorneys' fees, and costs.

At the conclusion of the non-jury trial on March 2, 2011, I directed the parties to file proposed findings of fact and conclusions of law.  Subsequently, on May 2, 2011, separate proposed findings of fact and conclusions of law were filed by plaintiff and defendants (collectively).

In the within Adjudication, I make Findings of Fact based upon the evidence adduced at trial, and Conclusions of Law based upon the legal principles and standards discussed in this Adjudication.

Based upon those Findings of Fact and Conclusions of Law, and the law applicable to this contract action, I entered a Verdict dated September 30, 2011, which accompanies this Adjudication.

---

[1]     As indicated below, shortly before trial defendant Brewster filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Tennessee.  In the absence of objection, on March 1, 2011, I entered an Order (Document 94) staying all proceedings against Mr. Brewster pending further order of the bankruptcy court.  In the same Order I directed the non-jury trial to proceed against only defendants Roofing, Middlesboro and LLC.

In that Verdict, I find in favor of plaintiff and against defendant Roofing in the amount of $2,553,696.67. I also find in favor of plaintiff and against defendant Middlesboro in the amount of $816,577.12, and against defendant LLC in the amount of $1,737,119.55.

At the close of plaintiff's case-in-chief at the trial of this matter, defendants made an oral motion on the record for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52. Pursuant to Rule 52(c), I declined to render any judgment until the close of the evidence.

Thereafter, pursuant to Fed.R.Civ.P. 52(a)(1), based upon the Findings of Fact and Conclusions of Law stated separately in this Adjudication, I entered an Order and Judgment under Federal Rule of Civil Procedure 58, which will be filed immediately after the filing of the within Verdict and Adjudication. In that Order and Judgment, I denied defendants' motion for judgment on partial findings. Specifically, I entered judgment on the Verdict in favor of plaintiff and against the B&B defendants in the amounts specified in the Verdict as described above.

### JURISDICTION

Jurisdiction in this case is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred in Lancaster, Lancaster County, Pennsylvania, which is within this judicial district. Moreover, by contract, the parties agreed to venue in this district.[2]

**PROCEDURAL HISTORY**

The procedural history of this matter is set forth more fully in my February 24, 2011 Opinion disposing of plaintiff's motion for summary judgment. To the extent it is not restated here, I incorporate that recitation of the procedural history.

This dispute arises from a business relationship wherein plaintiff Fabral, Inc., a supplier of construction materials, supplied construction materials to defendants B&B Metals of Middlesboro, Inc. and B&B Metals, LLC. Together with defendant B&B Roofing Company, Inc., defendants Middlesboro and LLC did business under the fictitious name B&B Roofing & Metals, Inc. (the "d/b/a").

Plaintiff's three-count Complaint filed January 21, 2009 alleges breach of contract against Middlesboro, LLC, and Roofing (collectively, "B&B defendants") (Count I); breach of contract against defendant Gary M. Brewster (Count II); and a

---

[2]     Complaint, paragraph 9; Complaint, Exhibit A (Credit Application and Agreement dated November 4, 2003), page 3, "JURISDICTION AND VENUE.".

claim for unjust enrichment against all defendants (Count III).
The Complaint alleges that the B&B defendants by a credit
agreement, and defendant Brewster by a personal guaranty, are
obligated to pay for all materials supplied to the B&B defendants
by plaintiff, but are in default.

By Order and Opinion dated February 24, 2011, I granted
in part, denied in part, and dismissed in part as moot,
Plaintiff's Motion for Summary Judgment.  Specifically, on Count
I, judgment was entered in favor of plaintiff and against
defendant Middlesboro in the amount of $498,136.98 and against
defendant LLC in the amount of $1,039,822.37 on liability and
compensatory damages only.  I reserved for trial the issue of
attorneys' fees, costs, and interest.  In the same Order, I
denied the motion for summary judgment against defendant Roofing.

In the February 24, 2011 Order, I entered judgment on
Count II in favor of plaintiff and against defendant Brewster in
the amount of $1,537,959.35 plus interest at the rate of twelve
percent per annum or the maximum rate permitted by law, whichever
is less, from January 12, 2009 until paid in full.

Finally, in the February 24, 2011 Order, I dismissed
Count III as moot.  I also dismissed the motion for summary
judgment as moot to the extent that it sought judgment in
plaintiff's favor on defendants' counterclaims, because
defendants had withdrawn their counterclaims.  Thus, the issues

at trial were limited to attorneys' fees, costs, and interest owed by the B&B defendants on Count I, and whether Roofing is liable to plaintiff for breach of the Credit Application and Agreement ("Agreement").

On March 1, 2011, the first day of trial in this matter, counsel for defendants advised me that defendant Brewster had filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Tennessee. The parties agreed that the filing of that petition acted as an automatic stay of any proceedings against Mr. Brewster, including this action, pursuant to 11 U.S.C. § 362(a).

However, plaintiff sought to proceed against the B&B defendants. Defendants did not object to proceeding against the non-bankrupt parties.[3] Accordingly, in the absence of objection, I entered an Order dated March 1, 2011 (Document 94) staying all proceedings against Mr. Brewster pending further order of the bankruptcy court.

In the same Order I directed that all proceedings in this matter, including the non-jury trial, would proceed against Roofing, Middlesboro, and LLC. Nothing in this Adjudication

---

[3]     Notes of Testimony of the non-jury trial conducted before me on March 1, 2011, styled "Non-Jury Trial - Day 1 Before The Honorable James Knoll Gardner[,] United States District Judge" ("N.T. 3/1/11"), at pages 47-53.

should be construed as adjudicating Mr. Brewster's rights in any respect.[4]

At trial, five witnesses testified. Plaintiff called Cathy Curtosi, who was previously employed as plaintiff's credit and collection manager; Don Smith, Fabral's territorial manager; and Carol Branch, the director of credit and collections for Fabral's parent company, Euramax. In its case-in-chief, plaintiff also called as of cross-examination Gary Brewster and James W. Yancey, Roofing's office manager and salesman, respectively. In their case-in-chief, defendants also called Mr. Brewster as a witness.

At the close of plaintiffs' case-in-chief, defendants moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure Rule 52(c). As permitted by that Rule, I deferred my ruling on defendants' motion until the close of the evidence, and took the motion under advisement.

On March 2, 2011, the second day of trial, at the close of defendants' case-in-chief, the parties made their closing arguments, and I took the matter under advisement. I also directed counsel to obtain a transcript of the entire non-jury trial and to submit numbered, written proposed findings of fact and conclusions of law on all of the issues, disputes, and

---

[4] Hereafter in this Adjudication, any reference to "defendants" in terms of what occurred at trial will refer only to the B&B defendants and should not be construed as suggesting that Mr. Brewster participated in the trial as a defendant. Rather, as discussed below, he testified as a witness.

contentions of the parties with specific citations to the trial record, and with citation to legal authority supporting each conclusion of law.

The parties filed their respective proposed findings of fact and conclusions of law on May 2, 2011.

## **FINDINGS OF FACT**

Based upon the testimony and evidence adduced at trial,[5] the pleadings, record papers, and the parties' post-trial submissions, I make the following Findings of Fact.

1.  Fabral is a corporation incorporated in the State of Delaware, and has its principal place of business at 3449 Hempland Road, Lancaster, Pennsylvania 17601.

2.  B&B Roofing Company, Inc. ("Roofing") is a corporation incorporated in the State of Tennessee, and has its principal place of business at 18231 Alberta Street, Oneida, Tennessee 37841.

3.  Until July 1, 2006, Roofing did business under the trade name "B&B Roofing and Metals, Inc."

4.  Roofing was formed as a business corporation in the State of Tennessee on January 25, 1994.

---

[5]     The Findings of Fact reflect my credibility determinations regarding the testimony and evidence presented at trial.  Credibility determinations are within the sole province of the finder of fact, in this case the court.  Fed.R.Civ.P. 52; See, e.g., Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 745 (1986).  Implicit in my findings is the conclusion that I found the testimony of some witnesses credible in whole, some in part, and have rejected portions of testimony of certain witnesses, as more fully explained in my discussion below.

5. During the period from November 4, 2003 until July 1, 2006, Roofing purchased metal roofing products at wholesale, and sold them at retail.

6. During the period from November 4, 2003 until July 1, 2006, plaintiff Fabral was one of the suppliers to Roofing of metal roofing products for resale pursuant to a Credit Application and Agreement ("Agreement").

7. Roofing bought and sold metal products until July 1, 2006, when it ceased retail operations.

8. Gary M. Brewster has been the Owner and President of Roofing since its formation.

9. B&B Metals of Middlesboro, Inc. ("Middlesboro") is a corporation incorporated in the Commonwealth of Kentucky and has its principal place of business at 110 N. 13th Street, Middlesboro, Kentucky 40965.

10. Middlesboro also does business under the trade name "B&B Roofing and Metals, Inc."

11. Middlesboro was formed as a business corporation in the Commonwealth of Kentucky on July 1, 2007.

12. B&B Metals, LLC ("LLC") is a limited liability company, the members of which are all domiciled in the State of Tennessee. Its principal place of business is at 18231 Alberta Street, Oneida, Tennessee 37841.

13. LLC also does business under the trade name "B&B Roofing and Metals, Inc."

14. LLC was formed as a limited liability company in the State of Tennessee on August 9, 2006.

## Credit Application and Agreement

15. In November 2003, Fabral employee Don Smith gave Gary Brewster the Agreement for Mr. Brewster to fill out and sign.

16. Mr. Smith was the salesman for the B&B defendants' account with Fabral from August 2003 until late 2008, and had primary responsibility for that account while defendants were customers of Fabral.

17. Mr. Smith did not complete the Agreement. Rather, he put his name on the Agreement in the blank space next to the term "Fabral Sales Representative", and Mr. Brewster filled in the rest of the Agreement.

18. Specifically, Mr. Brewster filled in the following information on the Agreement under "Corporation":

    a.  State of Incorporation: "TN";

    b.  Date of Incorporation: "1992";

    c.  Federal ID#: "62-1556152";

    d.  President: "Gary M. Brewster";

    e.  Vice-President: "Patricia L. Brewster";

    f.  Secretary/Treasurer: "Kenneth W. Blaker".

19. Roofing's Federal ID number was 62-1556152, the same number listed by Mr. Brewster in the Credit Application and Agreement.

20. The application also indicated that the applicant's name is "B&B Roofing & Metals Inc." and included a physical address of 18231 Alberta Street, Oneida, TN 37841 with a mailing address of P.O. Box 5237, Oneida, TN 37841 and a phone number of 423-569-6674.

21. Under the "Bank Reference Authorization" section of the application, Mr. Brewster listed "First Trust Savings Bank" and the contact person as "Gerald Pike", and supplied phone and fax numbers for the bank.

22. Under the "Trade References" section of the application, Mr. Brewster listed the following companies: "Baird & Wilson Sheet Metal"; "Wholesale Roofing Supply Inc."; "Exterior Metals Inc."; and "Towe Iron Works". He also supplied an address, phone number, and fax number for each.

23. Mr. Brewster filled in the following information in the application under "Additional Business Information":

    a. Is Sales Tax to be Included on Invoices?: "No";

    b. Describe Type of Business: "Retail Roofing".

24. The part of the Agreement showing that sales tax was not to be included on invoices indicates that the corporate entity which signed the Agreement was a reseller of metal products at the time of the application.

25. On November 4, 2003, Mr. Brewster signed the Agreement as President of "B&B Roofing & Metals, Inc."

26. "B&B Roofing & Metals Inc." is a fictitious entity that is not incorporated, but is the "d/b/a" (doing business as) trade name for Roofing, Middlesboro and LLC.

27. As of November 4, 2003, neither Middlesboro nor LLC had been formed.

28. In the Credit Application and Agreement, Mr. Brewster provided corporate information and references that related solely and exclusively to Roofing.

29. Mr. Brewster signed the Agreement on behalf of Roofing.

30. As the Owner and President of Roofing, Mr. Brewster had the authority to bind Roofing to the Agreement.

31. After Mr. Brewster completed the Credit Application and Agreement, he sent it to Fabral's credit department.

32. The practice of Fabral's credit department was to perform a bank check based upon the bank information provided in a credit application, and to check the trade references listed on the application.

33. Fabral did not check any type of corporate credit to ascertain if B&B Roofing and Metals, Inc. was a corporate entity.

**The Agreement's Non-Delegation Clause**

34. The Agreement at page 2 contains the following provision, under "FABRAL, INC. GENERAL TERMS AND CONDITIONS OF SALE":

> PAYMENT TERMS. All sales are cash prior to production except when credit has been approved by the credit manager. Upon approval of credit, terms are net cash thirty [(]30[)] days from date of invoice, unless otherwise specified.

35. The Agreement at page 3 also provides, under "FABRAL, INC. GENERAL TERMS AND CONDITIONS OF SALE":

> DELEGATION. Neither Buyer nor Seller may delegate the performance of any obligation without the written permission of the other.

## Fabral's Acquisition of Mountain Metals

36. In March 2006, Fabral acquired Mountain Metals Manufacturing Corporation ("Mountain Metals").

37. When Fabral acquired Mountain Metals, Fabral inherited the B&B defendants' outstanding balance owed to Mountain Metals of over one million dollars.

38. At the time Fabral acquired Mountain Metals, defendants had accounts payable to Fabral (that had been previously owed to Mountain Metals) which were 360 or more days past due.

39. At the time Fabral acquired Mountain Metals, Fabral had no customers other than defendants who had accounts payable of more than 360 days past due.

40. Fabral's payment terms for defendants were stricter than those which Mountain Metals had previously imposed on defendants.

41. Within a few months after Fabral acquired Mountain Metals, Mr. Brewster closed Roofing's retail operations effective July 1, 2006 and formed LLC in August 2006.

## Formation of Middlesboro and LLC

42. On August 9, 2006, Mr. Brewster formed LLC as a limited liability company qualified to do business in the State of Tennessee.

43. Neither Mr. Brewster nor James Yancey, who was employed by Roofing for the past thirteen years as the office manager and salesman, notified Fabral that LLC had been formed.

44. Roofing and LLC both operated from the same office at 18231 Alberta Street, Oneida, Tennessee.

45. Roofing and LLC both used the same post office box for receiving mail, namely, P.O. Box 5237, Oneida, Tennessee 37841.

46. Roofing and LLC both used the same telephone number, namely, 423-569-6674.

47. Mr. Yancey worked from a cubicle in the retail showroom of the office in Oneida, Tennessee that Roofing and LLC share.

48. Although he was employed by Roofing, which closed its retail operations as of July 1, 2006, Mr. Yancey's duties included posting sales for defendants' four retail stores, waiting on customers of the retail stores, and compiling sales of the retail stores and sending those compilations to defendants' accountant, Gary Marcum.

49. Mr. Yancey occasionally placed orders for defendants' four retail stores.

50. Until December 2008, Mr. Yancey had Mr. Brewster's full authority to sign checks in Mr. Brewster's name to suppliers of the retail stores, and he did in fact sign checks to suppliers until December 2008.

51. Among all of defendants' employees, only Mr. Yancey and Mr. Brewster had authority to sign checks to suppliers of the retail stores.

52. On July 1, 2007, Gary Brewster's son, Michael L. "Logan" Brewster, signed Articles of Incorporation establishing B&B Metals of Middlesboro, Inc. as a business corporation in the Commonwealth of Kentucky.

53. At the time that the Articles of Incorporation for Middlesboro were signed, Logan Brewster had just recently graduated from high school.

54. Gary Brewster designated his son Logan as the owner of Middlesboro as a way of getting Logan established in business.

55. Logan Brewster ran Middlesboro from defendants' office in Oneida, Tennessee.

56. Neither Gary Brewster nor Mr. Yancey notified Fabral that Middlesboro had been formed.

**Fabral's Invoices to Defendants**

57. Fabral shipped roofing products to defendants at one of defendants' four locations: Oneida, Harriman, and Knoxville, Tennessee; and Middlesboro, Kentucky.

58. Fabral sent invoices to defendants which indicated that the roofing products were sold to "B&B ROOFING & MTLS INC", regardless of the particular location to which the products were shipped, and indicating that the entity with which Fabral was doing business was "B&B Roofing & Metals".

59. The Fabral invoices also indicated that the roofing products were shipped to "B&B ROOFING & MTLS INC", regardless of the particular location to which the products were shipped.

60. When paying Fabral invoices, in some cases defendants enclosed with the check the Fabral invoices for which the check was payment. Those invoices indicated that the roofing products were sold to "B&B ROOFING & MTLS INC".

61. When paying Fabral invoices, in other cases defendants enclosed with the check the manufacturer's summary listing the invoices which were being paid. Those summaries indicated that the roofing products were sold to "B&B RFG & METALS".

62. When paying Fabral invoices, in some cases defendants enclosed the checks to Fabral in a return envelope with a return address of "B&B Roofing & Metals, P.O. Box 5237, Oneida, TN 37841."

63. When paying invoices sent to Middlesboro, defendants enclosed the checks to Fabral in a return envelope with a return address of "B&B Metals, 110 North 13th Street, Middlesboro, KY 40965."

64. On October 9, 2007, after both Middlesboro and LLC were formed, defendants wrote four checks to Fabral to pay invoices sent to each of their four locations.  None of the four checks listed the payer as "B&B Metals LLC" or "B&B Metals of Middlesboro, Inc."

65. "GPK Properties" was an entity that Defendants used to pay invoices sent to their Knoxville and Harriman retail stores.

66. "GPK" stands for "Gary" (Brewster), "Patricia" (Brewster), and "Kenny" (Blaker).

67. On the Credit Application and Agreement, Mr. Brewster listed himself, Patricia Brewster, and Kenny Blaker as the President, Vice-President, and Secretary/Treasurer, respectively, of Roofing.

68. According to Mr. Brewster, GPK Properties is "just an entity of B&B Metals" and he was unsure if it were registered anywhere.

69. GPK Properties paid Fabral invoices sent to the Knoxville retail store from a bank account at First Trust and Savings Bank of Oneida.  Mr. Yancey prepared such checks.

70. GPK Properties paid Fabral invoices sent to the Harriman retail store from a bank account at First National Bank of Oneida.  Mr. Yancey prepared such checks.

71. The only reason defendants gave for using the name "GPK Properties" instead of "B&B Metals Knoxville" or "B&B Metals Harriman" was that it was "easier for [defendants] to do it this way so the accountant could identify them when he did [defendants'] statements."

72. GPK Properties used the same mailing address (P.O. Box 5237) and the same telephone number (423-569-6674) as Roofing and LLC.

73. "B&B Metals, Inc." was an entity which defendants used to pay invoices sent to their Oneida retail store.

74. B&B Metals, Inc. paid Fabral invoices sent to the Oneida retail store from a bank account at First Trust and Savings Bank of Oneida. Mr. Yancey prepared such checks.

75. B&B Metals, Inc. used the same mailing address (P.O. Box 5237) and the same telephone number (423-569-6674) as Roofing and the LLC.

76. "B&B Metals" (without the "Inc." or the "LLC") was an entity which defendants used to pay invoices sent to their Middlesboro retail store.

77. "B&B Metals" paid Fabral invoices sent to the Middlesboro retail store from a bank account at First National Bank of Oneida. Mr. Yancey prepared such checks.

78. The checks drawn on that bank account at First National Bank of Oneida were in the name of "B&B Metals, Kevin Bilbrey, 287 Lizzie Lane, Oneida, TN 37841, Ph. (423) 569-6999".

79. Kevin Bilbrey was the manager of the Middlesboro retail store.

80. Mr. Yancey never wrote a check to be sent to Fabral from Roofing, nor did he ever write a check from Roofing to any metal supplier for retail sale.

81. Since 2005, Roofing had not purchased any materials from Fabral, including during 2008.

### Fabral's Credit Department

82. Cathy Curtosi was Fabral's credit and collections manager from October 2005 until April 2009.

83. Part of Ms. Curtosi's job was handling "problem and delinquent accounts".

84. Defendants' account, called "B&B Roofing and Metals" within Fabral's credit department, was a "problem or delinquent account" at Fabral.

85. Ms. Curtosi was the Fabral employee who had direct responsibility to collect the outstanding balance which defendants owed Fabral for roofing materials.

86. Ms. Curtosi knew defendants only by the name "B&B Roofing and Metals".

87. Ms. Curtosi spoke with Gary Brewster no less than once a week and had over a hundred telephone conversations with him.

88. In addition, Ms. Curtosi made two personal visits to Mr. Brewster at his office in Oneida, Tennessee.

89. In the process of attempting to collect the outstanding balance from defendants, Fabral requested updated financial information from Mr. Brewster about his company multiple times over several years.

90. Ms. Curtosi tried repeatedly to get an updated credit application from Mr. Brewster, but was unsuccessful. On the two occasions that she visited Mr. Brewster, Ms. Curtosi left credit applications for him to complete.

91. Mr. Brewster's responses to the requests for financial information included various reasons why he could not provide it, such as that it was unavailable, it was the year-end, his accountant was working on it, it was being compiled, and so forth.

92. After several years, Mr. Brewster finally provided financial information to Fabral's parent company, Euramax International, Inc.

93. In one conversation that Ms. Curtosi had with Mr. Brewster, Mr. Brewster told Ms. Curtosi that if Fabral took legal action over the outstanding balance which defendants owed

Fabral, Fabral would be waiting a long time for its money.

94. Neither Mr. Brewster nor Mr. Yancey informed Ms. Curtosi, either orally or by letter, that there were two new corporations (Middlesboro and LLC) which were purchasing metal materials from Fabral.

95. No one from the customer she knew as "B&B Roofing & Metals" sent Ms. Curtosi a letter stating that there were two new corporate entities, Middlesboro and LLC, through which defendants were purchasing metal products from Fabral.

96. During the time she was the credit and collections manager for Fabral, Ms. Curtosi had no knowledge of the existence of Middlesboro and LLC.

97. Neither Mr. Brewster nor Mr. Yancey explained to Ms. Curtosi what the entity "GPK Properties" was.

98. Ms. Curtosi asked either Mr. Brewster or Mr. Yancey why there were different checks coming from different locations of defendants, and she was told that the reason was just to keep the locations separate for bookkeeping and accounting purposes.

99. If Ms. Curtosi had been informed that two new corporate entities had been formed to do the actual purchasing of metal products from Fabral, Ms. Curtosi would have sought to obtain new credit applications from the entities to protect Fabral in the event of a default in payment.

100. Because Fabral wanted to know with whom it was doing business, its policy was to decline to do business with any company that would not complete a credit application.

101. If Fabral had been notified of a change in the customer's business, such as a change in ownership, Fabral would have asked for a

completed credit application for each legal entity. This was to protect Fabral in the event of a default by the customer.

102. During the time that he was Fabral's salesman for defendants' accounts, Don Smith believed that Fabral's customer, which he referred to simply as "B&B", was one company, operating from four locations.

103. In Mr. Smith's discussions with other Fabral employees about defendants' account, there was no distinction made between the roofing company and the metals company.

104. Mr. Smith visited Mr. Brewster at his office in Oneida about once or twice a month, for a total of nearly 100 visits between 2003 and 2008.

105. Mr. Smith spoke to Mr. Brewster on the telephone at least once a week, more than 100 times between 2003 and 2008.

106. In all of those telephone conversations, Mr. Brewster never informed Mr. Smith that defendants had more than one corporation buying materials from Fabral, or that he had set up separate corporations to handle retail sales.

107. Mr. Brewster never told Mr. Smith that he had formed Middlesboro or LLC.

108. The first time that Mr. Smith understood that defendants had separate corporations for contracting and retail sales, was after commencement of the within litigation, and he was no longer a salesman for defendants' account.

109. The first time that Mr. Smith knew that Mr. Brewster had partners in the business, namely his wife Patricia and Kenny Blaker, was on the day Mr. Smith's deposition was taken in the within litigation.

110. If Mr. Smith had known that Mr. Brewster had set up separate corporations to purchase products from Fabral for retail sales, Mr. Smith would have advised Fabral's credit department and recommended that Fabral obtain a new credit application to protect itself in the event of a default.

### Late Charges

111. The Agreement at page 2 provides, in part, under "FABRAL, INC. GENERAL TERMS AND CONDITIONS OF SALE":

> GOVERNING LAW. The Uniform Commercial Code as adopted in the Commonwealth of Pennsylvania...shall govern this sale, without reference to principles of conflicts of law."

112. The Agreement also contains the following provisions, under "FABRAL, INC. GENERAL TERMS AND CONDITIONS OF SALE":

> LATE CHARGES. If Buyer fails to pay any invoice in full when due, Buyer shall pay Seller 1½ % of the unpaid amount for each month or part of a month it remains unpaid. [At page 2.]
>
> ....
>
> INTERPRETATION, PAROL EVIDENCE. Buyer and Seller intend each invoice from Seller as the final, complete and exclusive expression of their agreement relating to the subject thereof. Except as otherwise provided in an invoice (including the reverse thereof), those General Terms and Conditions are incorporated into and form a part of every invoice from Seller. Acceptance or acquiescence in a course of performance shall not be relevant to determine the meaning of any invoice, even though the accepting or acquiescing party has knowledge of the nature of the performance and opportunity for

objection.  Seller's General Terms and
Conditions are subject to change without
notice.  In case of any discrepancy
among the general terms and conditions
as stated on the credit application,
order confirmation and the invoice, the
invoice shall govern. [At page 3.]

....

WAIVER.  Seller's waiver of any
provisions herein or any breach thereof
shall not constitute a waver of any
subsequent breach nor of any other
provision herein. [At page 3.]

113. Fabral's practice was to not assess late
charges to a customer until the customer's
account went into default status.

114. Consistent with this practice, Fabral did not
assess late charges against defendants until
their accounts were in default status.

115. Fabral generated and shipped an invoice at
the time of shipment of the product to the
customer.

116. During 2008, Fabral shipped products for LLC
to LLC's three locations, namely, Oneida,
Harriman, and Knoxville, Tennessee.

117. Payment for the Fabral products was due
within 60 days of the date of invoice.

118. As of March 1, 2011, LLC's Oneida location
had outstanding invoices for Fabral products,
covering transactions from March 5, 2008 to
December 11, 2008, of $210,624.22.

119. As of March 1, 2011, LLC's Oneida location
had accrued late charges on those outstanding
invoices of $102,152.61.

120. As of March 1, 2011, LLC's Harriman location
had outstanding invoices for Fabral products,
covering transactions from January 3, 2008 to
September 18, 2008, of $125,401.83.

121. As of March 1, 2011, LLC's Harriman location had accrued late charges on those outstanding invoices of $62,926.46.

122. As of March 1, 2011, LLC's Knoxville location had outstanding invoices for Fabral products, covering transactions from January 11, 2011 to December 19, 2008, of $703,796.32.

123. As of March 1, 2011, LLC's Knoxville location had accrued late charges on those outstanding invoices of $358,024.50.

124. As of March 1, 2011, LLC had outstanding invoices for Fabral products for all three of its locations totaling $1,039,822.37.

125. As of March 1, 2011, LLC had accrued late charges on those invoices totaling $523,103.57.

126. During 2008, Fabral shipped products to Middlesboro's one location in Middlesboro, Kentucky.

127. Payment for the Fabral products was due within 60 days of invoice.

128. As of March 1, 2011, Middlesboro had outstanding invoices for Fabral products, covering transactions from April 24, 2008 to December 12, 2008, of $498,136.98.

129. As of March 1, 2011, Middlesboro had accrued late charges on those outstanding invoices of $234,950.90.

130. As of March 1, 2011, the total of the outstanding invoices to both Middlesboro and LLC for Fabral products, covering transactions from January 3, 2008 to December 19, 2008, was $1,537,959.35.[6]

---

[6]    At trial, plaintiffs introduced into evidence spreadsheets which show the monthly balances and the total balances as of March 1, 2011 for each

(Footnote 6 continued):

131. As of March 1, 2011, the total of the late charges to both Middlesboro and LLC for those outstanding invoices was $758,054.47.[7]

132. LLC's percentage share of the total amount of the outstanding invoices to both Middlesboro and LLC is approximately 67.6%, that is LLC's share of $1,039,822.37 of the total outstanding invoices of $1,537,959.35.

133. Middlesboro's percentage share of the total amount of the outstanding invoices to both Middlesboro and LLC is approximately 32.4%, that is Middlesboro's share of $498,136.98 of the total outstanding invoices of $1,537,959.35.

**Attorneys' Fees and Costs**

134. The Agreement at page 3 provides, under "FABRAL, INC. GENERAL TERMS AND CONDITIONS OF SALE":

> COLLECTION COSTS AND ATTORNEYS' FEES. If Buyer fails to pay any invoice in full when due, Buyer shall pay Seller's collection costs. In the event of a lawsuit between Buyer and Seller, Buyer shall pay Seller's court costs and attorneys' fees.

---

(Continuation of footnote 6):

of the LLC's Oneida, Harriman and Knoxville locations (Plaintiff's Exhibits 16, 17 and 18, respectively) and Middlesboro (Plaintiff's Exhibit 19). They also introduced a cumulative spreadsheet which shows the total balances by month and as of March 1, 2011 (Plaintiff's Exhibit 15). The $1,537,959.35 figure that I find to be the total outstanding balance for all locations combined, as of March 1, 2011, is the total of each location's "Monthly Total Due" as listed on Plaintiff's Exhibits 16-19, and excludes late charges.

[7] Similarly, this figure is derived by adding the late charges shown on each of Plaintiff's Exhibits 16-19, and is $0.08 less than the total late charges of $758,054.55 shown on Plaintiff's Exhibit 15. At trial, Carol Branch, who is director of credit and collections for Fabral's parent company, Euramax, attributed the discrepancy to a "rounding" issue. N.T. 3/1/11 at 163.

135. Dilworth Paxson, LLP ("Dilworth") has represented Fabral in this litigation since the filing of the lawsuit in January 2009.

136. From January 6, 2009 until February 26, 2011, Dilworth's attorneys and paralegals have performed services in connection with Dilworth's representation of Fabral in this lawsuit.

137. On a monthly basis beginning on February 17, 2009, and continuing until February 15, 2011, Dilworth sent monthly invoices for legal services in connection with Dilworth's representation of Fabral in this lawsuit to Fabral's parent company, Euramax.

138. Dilworth billed Fabral for Dilworth's services in connection with its representation of Fabral in this lawsuit on an hourly basis, using the hourly rates of its attorneys and paralegals. The hourly rates for the attorneys who worked on the litigation ranged from $200 to $500, and the paralegal rates were below $200.

139. The monthly invoices set forth the tasks performed, the time billed for those tasks, and the value of those tasks based upon the hourly rates.

140. Dilworth also billed Fabral for Dilworth's costs incurred in connection with its representation of Fabral in this lawsuit.

141. During the course of this litigation, Dilworth's attorney's performed tasks relating to discovery, including requests for admissions, requests for the production of documents, interrogatories, and nine depositions.

142. During the course of this litigation, Dilworth's attorneys performed tasks relating to motions, including a motion to set aside entry of default and default judgment filed

by defendants, and a motion for summary judgment and motions *in limine* filed by plaintiff.

143. During the course of this litigation, Dilworth's attorneys participated in settlement discussions.

144. During the course of this litigation, Dilworth's attorneys performed tasks relating to trial preparation, in compliance with the court's trial attachment Order.

145. Plaintiff's Exhibits 21 (Affidavit of Christopher H. Casey, Esquire) and 24 (invoices for legal services) were received in evidence without objection, and defendants did not produce any evidence challenging the requested amount of attorneys' fees and costs.

146. As of February 28, 2011, Dilworth had accrued legal fees totaling $238,703.50 in connection with its representation of Fabral in this lawsuit.

147. As of February 28, 2011, Dilworth had accrued costs totaling $18,979.35 in connection with its representation of Fabral in this lawsuit.

148. As of February 28, 2011, the total amount of legal fees and costs that Dilworth accrued in connection with its representation of Fabral in this lawsuit was $257,682.85.

149. As of March 2, 2011, Fabral had paid all of the attorneys' fees and costs billed by Dilworth on or prior to that date in connection with Dilworth's representation of Fabral in connection with this lawsuit, except for $19,417.08.

150. Dilworth continues to accrue legal fees and costs in connection with its representation of Fabral in this lawsuit.

151. Applying the same percentage share as LLC's outstanding invoices bore to the total, that is 67.6%, LLC's percentage share of the total of attorneys' fees and costs incurred by Fabral is $174,193.61.

152. Applying the same percentage share as Middlesboro's outstanding invoices bore to the total, that is 32.4%, Middlesboro's percentage share of the total of attorneys' fees and costs incurred by Fabral is $83,489.24.

## <u>CONCLUSIONS OF LAW</u>

Applying my factual findings to the legal standards discussed below, which are applicable to this breach of contract case, I make the following conclusions of law.

1. At the time the Credit Application and Agreement ("Agreement") was entered into, Roofing, rather than B&B Roofing & Metals, Inc. (the "d/b/a" trade name), was the true party-in-interest.

2. The Agreement is a binding contract between Roofing and Fabral.

3. Roofing breached the Agreement's non-delegation clause by permitting Middlesboro and LLC to receive goods under the Agreement without first receiving Fabral's written permission for such delegation, and by failing to pay for those goods.

4. Roofing is liable to plaintiff for compensatory damages in the principal amount is $1,537,959.35, which represents the total of the outstanding invoices to both Middlesboro and LLC for Fabral products, covering transactions from January 3, 2008 to December 19, 2008, as of March 1, 2011.

5. Under the Agreement, plaintiff is entitled to late charges in the amount of one and one-half percent of the unpaid amount for each

month or part of a month that it has remained unpaid.

6.   Plaintiff did not waive its right to collect late charges by failing to assess them earlier.

7.   LLC is liable to plaintiff for late charges in the amount of $523,103.57, as of March 1, 2011.

8.   Middlesboro is liable to plaintiff for late charges in the amount of $234,950.90, as of March 1, 2011.

9.   Roofing is also liable to plaintiff for the full amount of the late charges owed by Middlesboro and LLC, for a total of $758,054.47.

10.  Because defendants failed to object to the admissibility at trial of Plaintiff's Exhibits 21 and 24 on the basis of improper foundation, their argument that there is no foundation for a determination of attorneys' fees and costs is waived.

11.  Plaintiff incurred attorneys' fees of $238,703.50 plus costs in the amount of $18,979.35, for a total of $257,682.85.

12.  The attorneys' fees and costs incurred and paid by plaintiff are reasonable.

13.  Roofing is liable for $257,682.85 in attorneys' fees and costs.

14.  Middlesboro is liable for $83,489.24 in attorneys' fees and costs.

15.  LLC is liable for $174,193.61 in attorneys' fees and costs.

## CONTENTIONS OF THE PARTIES

### Contentions of Plaintiff

Plaintiff contends that Roofing is liable for breach of the Credit Application and Agreement for two reasons. First, it avers that the Agreement was signed by Mr. Brewster for the purpose of binding Roofing to the contract. Plaintiff contends that the parties understood at the time of signing the Agreement that Fabral was extending credit to Roofing for the supply of roofing materials on request, which Roofing was to pay for.

Plaintiff further contends that Roofing impermissibly delegated its responsibilities to Middlesboro and LLC, in violation of the Agreement's non-delegation provision. Moreover, plaintiff asserts that the Uniform Commercial Code does not permit delegation where the other party has a substantial interest in having the first party perform.

Plaintiff contends that Fabral has such an interest here because it had only done a credit check on Roofing, and would have required a new credit application if it had been aware that Middlesboro and LLC were performing under the contract.

Second, plaintiff contends that even if the Agreement were not an enforceable contract against Roofing, Roofing is nevertheless liable under a theory of equitable estoppel. Specifically, plaintiff asserts that Roofing induced Fabral into believing that it was only dealing with one entity - Roofing -

when in fact it was dealing with several entities, including Middlesboro and LLC.  Moreover, plaintiff avers that it relied to its detriment on its belief that it was dealing with one company from whom it had a credit application and with whom it had a contract, which led Fabral to believe that it was protected and would be able to collect any outstanding balance from that entity.

Regarding late fees, plaintiff contends that it was its standard practice not to assess late fees until an account was in default.  Plaintiff contends that it has not waived its ability to collect late fees by failing to assess them sooner.  Moreover, plaintiff relies on the Agreement's non-waiver provision in support of its contention that even if there were a waiver at some earlier point, Fabral is not precluded from seeking late fees at a later point.  Therefore, plaintiff contends that defendants should pay late fees incurred pursuant to the Agreement.

Finally, plaintiff contends that pursuant to the Agreement's express provision regarding attorneys' fees and costs, defendants Middlesboro and LLC should pay attorneys' fees and costs in the amount of $257,682.85 accrued by Dilworth Paxson LLP in connection with its representation of plaintiff in this matter.  Plaintiff contends that this figure should be divided

between Middlesboro and LLC based on each entity's percentage of the overall purchases for which they were responsible.

Specifically, plaintiff avers that because LLC is responsible for 67.6% of the total outstanding invoices owed to Fabral, LLC should pay 67.6%, or $174,193.60[8], of the total attorneys' fees and costs. Similarly, Fabral avers that because Middlesboro is responsible for 32.4% of the total outstanding invoices, Middlesboro should pay 32.4%, or $83,489.24, of the total attorneys' fees and costs.

## Contentions of Defendants

Defendants contend that Roofing is not liable or responsible for any portion of the debt owed to plaintiff Fabral under the Agreement because Roofing was never a party to the Agreement.

---

[8]     In Plaintiff's Proposed Findings of Fact and Conclusions of Law filed May 2, 2011 (Document 101) ("Plaintiff's Findings"), plaintiff calculates LLC's percentage share of the total of attorneys' fees and costs incurred by plaintiff as $174,193.60 (Plaintiff's Finding 156). LLC's percentage share of plaintiff's total attorneys' fees and costs is actually $174,193.61. This $0.01 error in plaintiff's calculation is perhaps attributable to "rounding off".

The correct calculations are:

$238,703.50 plaintiff's attorneys' fees
             (Plaintiff's Finding 151)
+ 18,979.35 plaintiff's costs
             (Plaintiff's Finding 152)
$257,682.85 Total attorneys' fees and costs
             (Plaintiff's Finding 153)
x 67.6% LLC's percentage share of the total
             outstanding invoices owed to plaintiff
             (Plaintiff's Finding 137)
= $174,193.61 owed by LLC for attorneys' fees and costs

-31-

Rather, defendants contend that the Agreement was signed on behalf of B&B Roofing & Metals, Incorporated, and that if Fabral had run a credit check on that entity, it would have learned that no such entity existed because it was a trade name, and not actually a corporation. Therefore, defendants assert that plaintiff has "sat on its rights" by failing to check the "d/b/a" company's credit and by continuing to accept checks from the various companies.

Moreover, defendants aver that Roofing is not liable because all of the invoices were incurred by Middlesboro and LLC, not Roofing. They contend that during the relevant time period (2008), all purchases were made by Middlesboro and LLC, and that Roofing was no longer in the retail metals business, having ceased retail operations in 2006.

Regarding equitable estoppel, defendants contend that Fabral did not reasonably rely on Fabral's belief that it was dealing with one company. Specifically, defendants assert that there was never any indication that Fabral was dealing with Roofing. Rather, Fabral believed it was dealing with B&B Roofing & Metals, Inc., the "d/b/a", which did not legally exist at the time the Agreement was signed. Therefore, defendants contend that Roofing did not induce plaintiff in any way.

Defendants also aver that there was "very scarce intermingling" of activities among defendants.[9] Therefore, defendants contend that there was no confusion about which company was which, and that Roofing is not responsible for Middlesboro or LLC. Defendants further assert that there was not a joint venture.

Finally, regarding late fees and attorneys' fees, defendants contend that the request for attorneys' fees should be denied because there was no testimony at trial concerning the fees incurred by Fabral. Moreover, defendants aver that Fabral has waived its right to collect late fees by failing to assess such fees earlier.

## DISCUSSION

### Defendants' Motion for Judgment on Partial Findings

At the close of plaintiff's case-in-chief on the first day of trial, defendants orally moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). I deferred ruling on the motion until the close of evidence, and took the matter under advisement.

Rule 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment

_____

[9]    Notes of Testimony of the non-jury trial conducted before me on March 2, 2011, styled "Non-Jury Trial - Day 2 Before The Honorable James Knoll Gardner[,] United States District Judge ("N.T. 3/2/11") at page 57.

> against the party on a claim or defense that,
> under the controlling law, can be maintained or
> defeated only with a favorable finding on that
> issue.  The court may, however, decline to render
> any judgment until the close of evidence.  A
> judgment on partial findings must be supported by
> findings of fact and conclusions of law as
> required by Rule 52(a).

Fed.R.Civ.P. 52(c).

"In considering whether to grant judgment under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as it would at the conclusion of trial." EBC, Inc. v. Clark Building Systems, Inc., 618 F.3d 253, 272 (3d Cir. 2010).  Therefore, in evaluating a Rule 52(c) motion, the court "does not view the evidence through a particular lens or draw inferences favorable to either party." Id.  Moreover, the court may evaluate the credibility of witnesses where appropriate.  Id.

For reasons discussed below, I find favorably on plaintiff's claims.  Accordingly, I deny the motion for judgment on partial findings.

## Plaintiff's Claims for Breach of Contract

As discussed in my February 24, 2011 Order and Opinion, this matter is governed by Pennsylvania substantive law. Specifically, Count I is governed by the Uniform Commercial Code ("UCC"), as adopted in Pennsylvania, because the claim arises

from the Credit Application and Agreement, which provides for the application of such law.[10]

Relevant to this Adjudication, Count I alleges that Roofing breached the Agreement by accepting goods and failing to pay for them. Under the UCC as adopted in Pennsylvania, "[t]he buyer must pay at the contract rate for any goods accepted". 13 Pa.C.S.A. § 2607(a).

To state a claim for breach of contract in Pennsylvania, plaintiff must show (1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) resultant damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225-226 (3d Cir. 2003)(quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super. 1999). It is plaintiff's burden to prove the existence of a contract by a preponderance of the evidence. Viso v. Werner, 471 Pa. 42, 46, 369 A.2d 1185, 1187 (1977).

Under Pennsylvania law, "[i]f the court determines that a contract is clear, or unambiguous, then it construes the contract as a matter of law." Allegheny International v. Allegheny Ludlum Steel Corporation, 40 F.3d 1416, 1424 (3d Cir. 1994)(construing Pennsylvania law). "[W]hen the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Steuart v. McChesney,

---

[10]     Complaint, Exhibit A.

498 Pa. 45, 49, 444 A.2d 659, 661 (1982).  That is, "where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence."  <u>Id.</u> (internal quotation omitted).

Roofing suggests that the Agreement is not a binding contract between Roofing and Fabral, because the application was submitted on behalf of B&B Roofing and Metals, Inc. (the "d/b/a"), and not on behalf of Roofing.  This contention is based on the fact that the applicant listed on the Credit Application and Agreement, which was completed by Mr. Brewster, is "B&B Roofing & Metals, Inc.", not B&B Roofing Company, Inc.[11]

However, as part of the application, Mr. Brewster included the Federal ID number for Roofing, which is 62-1556152. He also included the same street address (18231 Alberta Street, Oneida, TN 37841), mailing address (P.O. Box 5237, Oneida, TN 37841), and telephone number (423-569-6674) that Roofing uses.

Accordingly, I conclude, and the parties do not dispute, that at the time the Agreement was entered, "B&B Roofing & Metals, Inc." was merely a trade name for Roofing.  Moreover, I conclude that Roofing, rather than the "d/b/a", was the true party-in-interest for purposes of the Agreement.  <u>See</u> <u>ASCO Healthcare, Inc. v. County of Chester</u>, 2000 WL 1793401, at *17

---

[11]    See N.T. 3/2/11 at 52-53.  Specifically, during closing argument at trial, defense counsel argued that "If a credit report would have been run, B&B Roofing & Metals, Incorporated, would have had zero credit.  It was an entity that did not exist....The party to the agreement and application is not B&B Roofing Company, Incorporated."  <u>Id.</u>

(E.D.Pa. November 21, 2000)(Rueter, M.J.).  This conclusion is supported by the fact that, at the time the Agreement was entered, neither Middlesboro nor the LLC was in existence. Roofing was the only one of the defendant companies which existed and was engaged in retail metal sales at that time.

Thus, for purposes of Count I, the Agreement is a contract between Roofing and Fabral.  However, defendant contends that, to the extent there is a binding contract between Roofing and Fabral, there has been no breach because Roofing did not receive the goods at issue.  Defendant also contends that, at the time the invoices at issue were incurred, Roofing was no longer in the retail metal sales business.

The Payment Terms as set forth in the Agreement provide that "All sales are cash prior to production except when credit has been approved by the credit manager.  Upon approval of credit, terms are net cash thirty [(]30[)] days from date of invoice, unless otherwise specified."[12]

As indicated above, I find that as of March 1, 2011, Middlesboro had outstanding invoices for Fabral products totaling $498,136.98.  I also find that, as of March 1, 2011, LLC had

_____

[12]     Agreement, page 2 (Exhibit A to the Complaint).

outstanding invoices for Fabral products totaling $1,039,822.37, based on products shipped to all three LLC locations.[13]

All of these invoices were incurred during 2008. It is clear, therefore, that payment was not made within thirty days of each invoice as required by the Payment Terms set forth in the Agreement. Defendants do not dispute this finding, but contend that Roofing is not liable for payment. Specifically, they contend that Middlesboro and LLC received all benefit from the purchase of the Fabral products which give rise to the invoices, by reselling those products to consumers.

However, plaintiff contends that Roofing breached the Agreement's non-delegation clause by permitting Middlesboro and

---

[13]     Defendants do not dispute that Middlesboro and LLC received the products. This conclusion is consistent with the determination in my February 24, 2011 Opinion granting in part plaintiff's motion for summary judgment.

Based on the undisputed facts before the court on summary judgment, I concluded in that Opinion that the Agreement constituted a binding agreement between all of the corporate defendants and plaintiff. Specifically, it was undisputed that Mr. Brewster signed the Agreement on behalf of all of the B&B defendants.

At trial, it was established that Middlesboro and LLC were not in existence at the time the Agreement was signed, and that Roofing was therefore the only one of the B&B defendants in the retail metal sales business at the time. Nevertheless, defendants agree that Middlesboro and LLC are contractually obligated under the Agreement. Specifically, defendants contend, in their proposed Finding of Fact in Support of Defendants' Motion for Judgment and Conclusions of Law filed May 2, 2011 (Document 100), that Middlesboro and LLC later ratified the Agreement and therefore are bound by it. (Defendants' proposed findings of fact and conclusions of law document does not contain page numbers, however, this particular proposed conclusion of law appears on page 6 of 8 as defendants' second proposed conclusion of law.)

As discussed below, I need not determine whether Middlesboro and LLC actually ratified the Agreement. Nonetheless, based on defendants' representations, I conclude that defendants concede the contractual liability of Middlesboro and LLC under the Agreement, which is consistent with my February 24, 2011 Opinion.

LLC to receive goods under the Agreement, and by failing to pay for those goods.  The Agreement's non-delegation clause provides that "Neither Buyer nor Seller may delegate the performance of any obligation without the written permission of the other."[14]

Defendants aver that the Agreement was entered into by Fabral and B&B Roofing & Metals, Inc., the "d/b/a" trade name. They also aver that Middlesboro and LLC later ratified the Agreement, thereby binding both Middlesboro and LLC to the Agreement.

In support of their contention that Middlesboro and LLC ratified the Agreement, defendants cite Rees v. Mosaic Technologies, Inc., 742 F.2d 765 (3d Cir. 1984), and Blackwood Coal Company, Inc. v. Deister Concentrator Company, Inc., 626 F.Supp. 727 (E.D.Pa. 1985)(Huyett, J.).

Defendants do not provide pinpoint citations or identify the specific propositions for which they rely in those cases.  I presume, however, that they rely on Blackwood for the proposition that although a corporation does not exist as a legal entity until it is incorporated, pre-incorporation acts by its promoters may form the basis for corporate liability when those pre-incorporation acts have been ratified by post-incorporation acts of the corporation. Blackwood, 626 F.Supp. at 729.

---

[14]    Agreement, page 2.

Blackwood also provides that, in addition to being held liable for breach of a contract which it has ratified, a corporation also has the right to enforce the terms of the contract. Id. Rees holds that under Pennsylvania law, pre-incorporation acts may subject a corporate defendant to personal jurisdiction in the state where liability is incurred, where the pre-incorporation acts have been ratified by the corporation. Rees, 742 F.2d at 769.[15]

Thus, although defendants' argument is unclear, I presume they rely on Blackwood and Rees for the general proposition that a corporation may be liable under, and may enforce, a pre-incorporation contract if the contract is later ratified by the corporation. In so contending, defendants concede that Middlesboro and LLC are bound by the Agreement. However, they neither specifically contend, nor offer legal

---

[15]    In its proposed findings of fact and conclusions of law filed May 2, 2011 (Document 100), defendants aver that the following facts support the conclusion that Middlesboro and LLC ratified the Agreement: (1) All of the B&B defendants have used the "d/b/a" trade name "B&B Roofing & Metals, Inc." at some point during their respective histories; (2) the Agreement was submitted by the "d/b/a" to Fabral, having been signed by Mr. Brewster, on November 4, 2003; and (3) payments were sent to plaintiff by LLC. (See defendants' proposed conclusion of law 2, and corresponding proposed facts.)

They also contend that plaintiff had reasonable notice that no entity named "B&B Roofing & Metals, Inc." actually existed at the time of the credit check; that plaintiff bought and sold metal products to, and invoiced and was doing business with, "B&B Roofing & Metals, Inc."; that LLC has used the "d/b/a" trade name since before 2006 and purchased metal under that name; that the B&B metal sales and roofing entities have been "kind of separate" since 2000 or 2001; and that plaintiff regularly received documentation, by way of payment checks, that other entities existed and "B&B Roofing & Metals, Inc." did not. (See defendants' proposed conclusion of law 2, and corresponding proposed facts 13-19.)

authority in support of any such contention, that ratification of the Agreement by Middlesboro and LLC ameliorates or obviates Roofing's obligations under the Agreement.

On the contrary, the Agreement specifically states that "Neither Buyer nor Seller may delegate the performance of any obligation without the written permission of the other."[16]   The facts as I have found them in this case are that although Cathy Curtosi, Fabral's credit and collections director during the relevant time period, had over 100 telephone conversations with Mr. Brewster, neither he nor Mr. Yancey informed her, either orally or by letter, that Middlesboro and LLC had been created and were purchasing metals materials from Fabral.  Indeed, no one from the customer she knew as "B&B Roofing & Metals" ever sent Ms. Curtosi a letter stating that defendants were purchasing metals products from Fabral through Middlesboro and LLC.

Additionally, no one from the B&B defendants ever advised Don Smith, the sales manager for their account, that Middlesboro and LLC entities were in existence and were purchasing Fabral products under the Agreement.  This was despite the fact that Mr. Smith had over 100 phone conversations with Mr. Brewster and visited Mr. Brewster's office close to 100 times between 2003 and 2008.  There is no evidence that Roofing ever

---

[16]     Agreement, page 2.

advised Fabral in writing that Middlesboro and LLC were purchasing Fabral products under the Agreement.

Nevertheless, defendants contend that Fabral was on notice that Middlesboro and LLC were purchasing products under the Agreement, based on the fact that payment checks drawn on various accounts were sent to Fabral. However, I found credible Ms. Curtosi's testimony that when she asked Mr. Brewster or Mr. Yancey why there were different checks coming from different locations of defendants, she was told that the reason was just to keep the locations separate for bookkeeping and accounting purposes. During the relevant time period, no one from the B&B defendants ever advised her that there were multiple business entities making purchases under the Agreement.

Notwithstanding any suggestion by defendants that Fabral failed to perform adequate due diligence and should have further investigated why payment checks were drawn on different accounts, the record is clear that Roofing did not advise Fabral in writing of its intention to delegate its obligation under the Agreement (that is, its obligation to pay for products received), much less receive Fabral's written permission for such delegation as required by the Agreement.

Because the non-delegation clause of the Agreement is clear and unambiguous in its provision that neither party may delegate its obligations under the Agreement without the written

permission of the other, I construe the contract as a matter of law. <u>Allegheny International</u>, 40 F.3d at 1424. Moreover, based on the facts discussed above, I conclude that defendant Roofing breached the Agreement by attempting to delegate to Middlesboro and LLC its obligation to pay for products received from Fabral.

Accordingly, I conclude that on Count I, defendant Roofing is liable to plaintiff for the amount of damages incurred as a result of Roofing's breach. As concluded above, that principal amount is $1,537,959.35, which represents the total of the outstanding invoices to both Middlesboro and LLC for Fabral products, as of March 1, 2011, covering transactions from January 3, 2008 to December 19, 2008.

In my February 24, 2011 Order and Opinion on plaintiff's motion for summary judgment, I reserved for trial all issues related to late fees and attorneys' fees on Count I. Plaintiff contends that under the Agreement, it is entitled to both late charges and attorneys' fees against Roofing, the LLC, and Middlesboro. I will address each in turn.

### Late Charges

The Agreement provides that "If Buyer fails to pay any invoice in full when due, Buyer shall pay Seller 1½ % of the unpaid balance for each month or part of a month if it remains unpaid."[17] Here, plaintiff's practice was to not assess late

---

[17]    Agreement, page 2 ("LATE CHARGES").

charges to a customer until the customer's account went into default status.  Consistent with this practice, Fabral did not assess late charges against the B&B defendants until their accounts were in default status.

Defendants contend that plaintiff waived its rights under this provision by failing to assess late charges against defendants in the course of the parties' dealing.  They also contend that plaintiff waived its right to collect late fees by failing to notify defendants of any impending late fees and that the late fees would begin to be assessed against defendants.

Plaintiff contends that the Agreement contains an anti-waiver provision which makes the parties' course of dealing irrelevant to a determination of whether plaintiff is entitled to collect late charges.  That is, plaintiff avers that the anti-waiver provision precludes any argument by defendants that the parties waived an express contractual term by their conduct.

Alternatively, plaintiffs assert that defendants have failed to carry their burden of showing that Fabral waived the late charges through course of performance, because Fabral's course of performance was not inconsistent with the express terms of the Agreement's late charges provision.

The anti-waiver clause upon which plaintiff relies provides: "Seller's waiver of any provisions herein or any breach thereof shall not constitute a waiver of any subsequent breach

nor of any other provision herein."[18]  The waiver provision

"vitiates the effect of any alleged practice of the parties to

the contrary."  F.D.I.C. v. Houran Plaza Associates,

1992 WL 158409, at *3 (E.D.Pa. 1992)(Broderick, S.J.).

Moreover, the waiver provision of the Agreement is

clear and unambiguous, and defendants do not contend otherwise.

Allegheny International, 40 F.3d at 1424.  Therefore, I must give

effect to the express language of the agreement, without the need

to resort to extrinsic evidence regarding course of performance.

See Steuart v. McChesney, 498 Pa. at 49, 444 A.2d at 661 (1982).

Accordingly, I conclude that under the Agreement,

plaintiff is entitled to late charges in the amount of one and

one-half percent of the unpaid amount for each month or part of a

month that it has remained unpaid.  As discussed above, Roofing

is contractually bound by the Agreement, and defendants do not

dispute that Middlesboro and LLC are also contractually bound by

the Agreement.

At trial, Carol Branch, who is director of credit and

collections for Fabral's parent company, Euramax, testified

regarding the late fees assessed based on invoices for products

shipped to Middlesboro and each of the three locations of LLC.  I

found credible her testimony, together with Plaintiff's Exhibits

15-19, that as of March 1, 2011, the LLC had accrued late charges

---

[18]     Agreement, page 3 ("WAIVER").

totaling $523,103.57 on outstanding invoices for Fabral products. I also credit her testimony, together with the relevant exhibits, that as of March 1, 2011, Middlesboro had accrued late charges of $234,950.90 on its outstanding invoices for Fabral products, covering transactions from April 24, 2008 to December 12, 2008.

Because the parties agree that Middlesboro and LLC are both contractually obligated under the Agreement, I find that that Middlesboro is liable to plaintiff for late charges in the amount of $234,950.90, and that LLC is liable to plaintiff for late charges in the amount of $523,103.57, each of which amounts was calculated as of March 1, 2011.

Moreover, as discussed above, Roofing is obligated under the Agreement for the outstanding invoices. For the same reasons, I conclude that Roofing is also liable to plaintiff for the full amount of the late charges accrued on invoices for products shipped to the LLC's locations and Middlesboro, for a total of $758,054.47.[19]

### Attorneys' Fees and Costs

Finally, I address plaintiff's claim for attorneys' fees and costs. The Agreement provides: "If Buyer fails to pay any invoice in full when due, Buyer shall pay Seller's collection costs. In the event of a lawsuit between Buyer and Seller, Buyer

---

[19]    Roofing is liable for the full amount. However, that amount includes late charges of $234,950.90 also owed by Middlesboro; and late charges of $523,103.57 also owed by LLC.

shall pay Seller's court costs and attorneys' fees."[20]  Neither
party contends that this provision is ambiguous, and so I
construe it as a matter of law.  See Allegheny International,
40 F.3d at 1424.

Plaintiff contends that it is entitled to reasonable
attorneys' fees and costs totaling $257,682.85, all of which is
attributable to Roofing.  Plaintiff additionally contends that,
of that total amount, LLC is liable for $174,193.61 (67.6 percent
of the total attorneys' fees plus costs) which corresponds with
LLC's proportionate share of the total invoices outstanding.
Plaintiff also contends that Middlesboro is liable for $83,489.24
(32.4 percent of the total attorneys' fees plus costs) which
corresponds with Middlesboro's proportionate share of the total
invoices outstanding.

In support of its contention, plaintiff relies on the
Affidavit of Christopher H. Casey, Esquire, which was received
into evidence at trial as Plaintiff's Exhibit 21.  Plaintiff also
relies on invoices billed by its attorneys, Dilworth Paxson LLP
("Dilworth"), for services rendered in this matter from
January 6, 2009 through March 2, 2011.  Those invoices were
received into evidence at trial as Plaintiff's Exhibit 24.

Defendants contend that plaintiff is not entitled to
attorneys' fees and costs because there is no record evidence

---

[20]     Agreement, page 3 ("COLLECTION COSTS AND ATTORNEYS' FEES").

(that is, testimony by Fabral witnesses) that plaintiff actually incurred the fees set forth in the invoices and referenced in Attorney Casey's affidavit.

In support of this contention, defendants rely on Braden v. University of Pittsburgh, 477 F.2d 1 (3d Cir. 1973). Although no pinpoint citation is provided by defendants, they apparently rely on Braden for the proposition that unsubstantiated sums of money stated in a party's brief cannot be treated as record evidence unless specifically admitted by the adversary side.  Id. at 6.

Defendants also rely on McMullen v. Kutz, 603 Pa. 602, 985 A.2d 769 (2009), which holds, in relevant part, that "parties may contract to provide for the breaching party to pay the attorney fees of the prevailing party in a breach of contract case, but...the trial court may consider whether the fees claimed to have been incurred are reasonable, and to reduce the fees claimed if appropriate."  603 Pa. at 614-615, 985 A.2d at 776-777.[21]

_____

[21]    Defendants also cite Williams v. Morton, 343 F.3d 212 (3d Cir. 2003).  (All three cases are cited in support of defendant's seventh proposed conclusion of law, which appears in Document 100 on the docket of this case on page 7 of 8.)  Defendants do not provide a pinpoint citation and the relevance of Williams is unclear, as it does not appear to support defendant's contention that plaintiff is not entitled to attorneys' fees because the record does not support a finding that plaintiff in fact incurred the fees.

Williams is an appeal from the district court's entry of summary judgment in a prisoner civil rights action pursuant to 42 U.S.C. § 1983. Among other issues, it involves evidentiary issues in that the plaintiff prisoners argued that certain testimony should have been precluded based on a

(Footnote 21 continued):

-48-

At trial, defendants did not object to the admissibility of either of Plaintiff's Exhibits 21 and 24.[22] Although they now appear to argue that the exhibits lack foundation because no Fabral witness testified that Fabral actually incurred the fees and costs set forth therein, defendants failed to object to the exhibits' admission at trial on the basis of improper foundation. Therefore, the objection is waived. See State Farm Mutual Automobile Insurance Co. v. Lincow, 715 F.Supp.2d 617, 635 n. 16 (E.D.Pa. 2010)(Robreno, J.)(citing, inter alia, Government of the Virgin Islands v. Archibald, 987 F.2d 180, 184 (3d Cir. 1993)).

Accordingly, I consider Plaintiff's Exhibits 21 and 24 for purposes of determining the applicable attorneys' fees and costs to which plaintiff is entitled under the Agreement, notwithstanding the absence of any additional evidence in the form of testimony from Fabral witnesses regarding those two exhibits or attorneys' fees generally.

---

(Continuation of footnote 21):

discovery violation, which is not at issue here.  See Williams, 343 F.3d at 222.  Based on my review of Williams, I conclude that it is not relevant to the issue before this court.

[22]    Plaintiff's Exhibit 21, which is Attorney Casey's affidavit, was offered into evidence on the first day of trial.  Defendants did not object to its entry, and it was received into evidence in the absence of objection. (N.T. 3/1/11 at 173.)  On the second day of trial, plaintiff's case-in-chief was reopened for the purpose of offering Plaintiff's Exhibit 24 into evidence, and defendants did not object to its admissibility.  It, too, was received into evidence in the absence of objection.  (N.T. 3/2/11 at 35.)

Under Pennsylvania law, contracts providing for the payment of attorneys' fees and litigation expenses in a reasonable amount are enforceable.  What constitutes a reasonable amount of fees and expenses is subject to the court's equitable control, and the following factors are relevant in determining the reasonableness of fees and expenses under Pennsylvania law:

> [T]he amount and character of the services rendered; the labor, time and trouble involved; the character and importance of the litigation; the amount of money or value of property affected; the professional skill and experience called for; the standing of the attorney in his profession; and the pecuniary benefit derived from the success.

Krueger Associates, Inc. v. ADT Security Systems, 2000 WL 10394, at *2 (E.D.Pa. Jan. 5, 2000)(Kelly, Robert F., J.)(quoting Nationwide Energy Corporation v. Kleiser, 1987 WL 10655, at *2-3 (E.D.Pa. May 7, 1987)(Broderick, S.J.)(interpreting Pennsylvania law).

Here, Attorney Casey's affidavit avers that Dilworth Paxson LLP has represented Fabral since the filing of this lawsuit in January 2009, and that Dilworth attorneys have rendered professional services on Fabral's behalf at rates ranging from $250.00 to $390.00 per hour.[23]

---

[23]    Plaintiff's Exhibit 21.

Defendants do not challenge the reasonableness of the rates or time spent on the case by plaintiff's counsel.[24] Moreover, based on a review of the invoices which compose Plaintiff's Exhibit 24, I conclude that the fees and costs are reasonable given the nature of the litigation and the amount of money damages involved in this case.

Specifically, the docket of this matter reflects that in addition to engaging in discovery, the parties litigated issues related to default judgment and summary judgment. At least eight depositions were taken,[25] and the parties prepared for, and appeared at, a two-day non-jury trial.

Based on this amount of litigation, and the fact that the amount in controversy exceeds $1.5 million plus more than $750,000.00 in late charges, I conclude that plaintiff's requested attorneys' fees of $238,703.50 plus costs in the amount of $18,979.35, for a total of $257,682.85, are reasonable. Krueger, 2000 WL 10394, at *2. Moreover, defendants identify no particular invoices which are unreasonable based on the time

---

[24] In closing argument at trial, defense counsel stated that "I have not disputed his rate, his time, anything of that nature" but argued that there had been no testimony establishing that Fabral had actually incurred the fees and costs. (N.T. 3/2/11 at 49-50.) I conclude, therefore, that defendants concede the reasonableness of the fees and costs. Moreover, as discussed above, by failing to object to the exhibits' admissibility, defendants have waived their argument that the exhibits lack foundation.

[25] See docket entries 71-78 and 80, which are transcripts from depositions of Gary Brewster (two volumes), James Yancey, Logan Brewster, Donald Smith, Edward Baird, Jeff Courtney, Scott Bacon, and C.L. "Butch" Baird.

spent or the rate charged. Indeed, as noted above, defendants concede the reasonableness of the fees and costs.

Accordingly, I award plaintiff attorneys' fees and costs in the total amount of $257,682.85. Because I have already determined that all three B&B defendants are liable under the Agreement, I conclude that Roofing is liable for the entire $257,682.85.

As between Middlesboro and LLC, at trial, plaintiff proposed that each of those defendants be assessed a proportionate share of the attorneys' fees based on their respective portions of the total underlying invoices. I agree that this approach is logical and practicable.

Accordingly, I conclude that LLC is liable for $174,193.61 (67.6 percent of the total attorneys' fees plus costs). This corresponds with the LLC's proportionate share of the total invoices outstanding. In addition, Middlesboro is liable for $83,489.24 (32.4 percent of the total attorneys' fees plus costs). This corresponds with Middlesboro's proportionate share of the total invoices outstanding.

## CONCLUSION

Based upon the Findings of Fact, Conclusions of Law and Discussion contained in this Adjudication, I entered the Verdict accompanying this Adjudication.

In that Verdict I find in favor of plaintiff Fabral, Inc. and against defendant B&B Roofing Company, Inc. on Count I of plaintiff's Complaint in the amount of $2,553,696.67.[26]

In that Verdict I also find in favor of plaintiff and against defendant B&B Metals of Middlesboro, Inc. on Count I of plaintiff's Complaint in the amount of $816,577.12.[27]

Finally, in that Verdict I find in favor of plaintiff and against defendant B&B Metals, LLC in the amount of $1,737,119.55.[28]

By separate Order and Judgment which will be filed immediately after the within Verdict and Adjudication, I deny defendants' oral motion for judgment on partial findings made on the record at trial, and I enter judgment on the Verdict accompanying this Adjudication.

---

[26]     This amount includes $1,537,959.35 in principal balance owed on the outstanding invoices, $758,054.47 in late charges, and $257,682.85 in attorneys' fees and costs ($238,703.50 attorneys' fees plus $18,979.35 costs).

[27]     This amount includes $498,136.98 in principal balance as determined in my February 24, 2011 Order granting summary judgment, plus $234,950.90 in late charges and $83,489.24 in attorneys' fees and costs ($77,339.93 attorneys' fees plus $6,149.31 costs) as determined in the accompanying Verdict and Adjudication.

[28]     This amount includes $1,039,822.37 in principal balance as determined by my February 24, 2011 Order granting summary judgment, plus $523,103.57 in late charges and $174,193.61 in attorneys' fees and costs ($161,363.57 attorneys' fees plus $12,830.04 costs) as determined in the within Verdict and Adjudication.

          See footnote 3 to the accompanying Verdict, which is incorporated here, prohibiting plaintiff from collecting a "double recovery" by limiting plaintiff's recovery on the within judgment to $2,553,696.67.